h DAVID S. GORBATY, Judge.
The Louisiana State Racing Commission (Racing Commission) appeals a judgment of the Civil District Court reversing a ruling of the Racing Commission suspending Dr. Claude L. Stephenson’s license and racing privileges for two years and fining him $10,000 for violating the Rules of Racing. For the following reasons, we reverse, and reinstate the ruling of the Racing Commission.
FACTS AND PROCEDURAL HISTORY:
On November 14, 2003, Carl Giesse (Giesse), the owner/trainer of the racehorse, Delightster, telephoned Dr. Claude L. Stephenson (Dr. Stephenson), an equine veterinarian, licensed to practice in this state and Delightster’s attending veterinarian at Delta Downs in Vinton, Louisiana, requesting the doctor’s attention to Delightster for a possible emergency medical condition. Giesse testified that he told the doctor he believed his horse was becoming colicky, a potentially fatal condition. Kent Pevoto, an employee of the Calcasieu Parish Sheriffs Office and an investigator for the Racing Commission[1], testified that Dr. Stephenson told him 12Giesse called him because the horse was unusually nervous. Dr. Stephenson testified that Giesse told him the horse was cramping up.
Dr. Stephenson, who at the time of the phone call was giving horses in another barn “p.m.” injections[2], was concerned about the potential emergency situation with Delightster. He immediately got in his van and drove to the receiving barn that housed all horses racing in that evening’s race. Dr. Stephenson claims that he went into the stall with Delightster and the groom, Jesus, and listened to the horse’s belly with his ear. As he bent over, a syringe fell out of his shirt pocket. He picked it up, and was holding it near the horse’s neck when the two investigators saw him. Dr. Stephenson explained that the syringe (marked as Exhibit A at the hearing) had been used to inject a horse in another barn with AMP mixed with vitamin B12[3] prior to his arriving at the receiving barn. He also had a second syringe (marked as Exhibit B) in his pocket that contained magnesium sulfate, which he explained was used to quiet nervous horses. Dr. Stephenson vehemently denied injecting Delightster with anything on the night in question. In fact, he stated that after examining the horse, he believed it to be well enough to race that evening.
Carl Giesse testified that he called Dr. Stephenson because Delightster’s flanks were sweating and he was trying to bite himself in that area. He feared the |;Jiorse *927 was “tying up,” or becoming colicky. He admitted that he suggested Dr. Stephenson give Delightster some B1 with calcium, then some B12, two medications prohibited within four hours of a race. Giesse testified that Dr. Stephenson did not comment on his suggestion. Giesse also admitted that at the first meeting with the track stewards on the night in question he omitted telling the stewards about his request, but the next day called one of the stewards and confessed. He was ultimately fined for his actions.
Giesse stated that after calling Dr. Stephenson he went to the track café to get coffee for himself and his groom. Giesse testified that he was only gone from the receiving barn for a matter of minutes. When he returned, the investigators had arrived, and Dr. Stephenson was standing outside the barn near his van. Giesse went in and checked his horse. He then spoke with Dr. Stephenson who assured him the horse was okay, then they were both ordered to report to the track stewards.
Carlene McGarity, a licensed investigator for the Racing Commission who had been employed for approximately two weeks on November 14, testified that she and her partner, Kent Pevoto, were patrolling the track when a white van speeded by them. Pevoto, who was driving, followed the van. They arrived at the receiving barn, parked on the side opposite the white van, and entered. They proceeded down one row of stalls, then up the next. As they passed stall # 57, McGarity observed a groom holding a horse’s reins to keep the horse’s head away from another man in the stall. The man, whom she learned was Dr. Stephenson, [¿was standing next to the horse with what appeared to be a syringe in his right hand up against the horse’s neck. McGarity testified that when the doctor realized that she saw him, he looked startled and attempted to hide the syringe from view. When Pevoto later requested Dr. Stephenson to surrender the syringe, the doctor first refused, and then pulled two syringes from his right front pants pocket. McGarity stated that the syringe she saw in the doctor’s hand was Exhibit A, a nearly empty syringe with a small amount of a reddish brown substance in it. The other syringe (Exhibit B) was full. The investigator admitted that she never witnessed the doctor injecting the horse, but she had a clear view of his right hand holding an empty syringe against the horse’s neck.
Kent Pevoto testified that on November 14, 2003, he was working his third season at Delta Downs. He admitted that he knew Dr. Stephenson from a previous incident. Pevoto stated that he and his partner witnessed a white van speed by them. He was not sure if it was Dr. Stephenson, but knew it to be a veterinarian’s van. Pevoto made the decision to follow the van based on several factors: 1) he knew it was a vet’s van; 2) the van was headed to the barn where only horses racing that night were stalled; 3) he knew it was within the four-hour rule[4]; and, 4) he believed it could be an emergency situation, or a possible infraction about to happen.
Pevoto explained that he parked his vehicle on the opposite side of the barn from where Dr. Stephenson had parked because if an infraction was being | ^committed he did not want to eliminate the element of surprise. Approximately 3 to 5 minutes elapsed between the time Dr. Stephenson entered the barn to the time Pevoto and his partner saw him in stall # 57. Pevoto observed the doctor with a syringe (Exhibit A) in his hand. When the doctor real *928 ized he was being watched, he palmed the syringe, turned away, and placed the syringe in his right front pants pocket. Pe-voto asked the doctor to step out of the stall and to surrender the syringe. At first, Dr. Stephenson refused, but complied after a second request, producing two syringes from his right front pants pocket. The doctor told Pevoto that the larger syringe (Exhibit A) contained AMP, and the smaller syringe (Exhibit B) contained magnesium. Dr. Stephenson explained that he had administered the contents of the empty syringe to a horse in barn # 20 prior to arriving at the receiving barn; however, the doctor could not recall the name of the horse. When asked why he had the syringe in his hand, the doctor told Pevoto he was using it as a “pointing device.” Pevoto testified that Dr. Stephenson told him he had been called by Giesse because Delightster was nervous, and explained that magnesium was used to quiet a horse.
Pevoto called the stewards to report a possible infraction. They waited 15 to 20 minutes for Giesse to return from the café, and Pevoto eventually sent the groom to retrieve him. Giesse admitted to Pevoto that he had asked the doctor to check on Delightster and to give another horse La-six.[5] Pevoto pointed out to Giesse that administering Lasix to a horse racing that night would be an infraction. | s Pevoto testified that Giesse did not respond, nor did he later report this to the stewards.
Pevoto and McGarity escorted Dr. Stephenson and Giesse to the stewards’ office. Pevoto testified that Dr. Stephenson told the stewards he was using the syringe as a pointing device. The doctor explained that injecting a horse with AMP that close to post time would be of no use because to be effective it had to be administered at least 24 hours before. The doctor further explained that the magnesium in the other syringe was for another horse not racing that night.
On cross-examination, Pevoto admitted that he did not witness Dr. Stephenson inject the horse. He was also aware that the horse tested negative for drugs, but offered that he knew AMP would not show up in a drug test.
Steward Aaron Enigh, employed by Delta Downs on the night in question, testified that Dr. Stephenson admitted he had two syringes with him in the receiving barn within 4 hours of race time. Dr. Stephenson explained that he was using the syringe as a pointer to show the groom the symptoms of colic.[6] Enigh denied that Dr. Stephenson told him the syringes had fallen out of his pocket. Based on what was reported that evening, the stewards ordered Delightster scratched from that evening’s race, and ordered him to be tested.
Dr. Stephen A. Barker was qualified as an expert in the fields of chemistry, toxicology and pharmacology. He testified that Exhibit A contained a reddish 17residue, but the residue was negative for the presence of any illegal substances. The substance in Exhibit B tested positive for the presence of thiamine, or vitamin Bl. Although Dr. Barker could not positively identify the residue in Exhibit A, he was present during Dr. Stephenson’s testimony and heard him tell the commission that the substance was AMP. Dr. Barker *929 explained that AMP would be administered for energy, and that to have any effect it would have to be administered within 2 to 4 hours of the race, thus disputing Dr. Stephenson’s claim that it would be injected 24 hours before a race for effectiveness. He also explained that people in the racing industry are aware that AMP cannot be detected in any of the routine drug tests. Dr. Barker characterized the thiamine mixed with calcium or magnesium in Exhibit B as a “calming agent.”
Following Dr. Barker’s testimony, one of the commissioners commented for the record that the substances in the syringes were exactly the same substances Giesse admitted to suggesting Dr. Stephenson give his horse, Delightster.
In his case in chief, Dr. Stephenson disagreed with Dr. Barker categorizing AMP as a stimulant. Instead, Dr. Stephenson claimed it simply lowered a horse’s “second wind syndrome,” thereby preventing the horse from becoming tired as quickly. He admitted that Giesse gave him permission to medicate Delightster, but after examining the horse, he found it did not need any medication. He knew that if he had medicated the horse, it would have to be scratched from that evening’s race. Dr. Stephenson denied knowing AMP by the nickname “red soda pop.” In fact, he claimed the substance in the empty syringe was yellow-tinted, not red.
1 ^Following informing the commission of Dr. Stephenson’s prior infractions, suspensions and fines, and closing arguments, the commission retired to deliberate. Upon reconvening, a motion was made to suspend Dr. Stephenson for two years and fine him $10,000. The motion carried unanimously.
Dr. Stephenson filed a Petition for Judicial Review of the commission’s decision to the Civil District Court for the Parish of Orleans. Following arguments and briefing, the district court issued a judgment reversing the findings of the commission. In written reasons, the trial court stated that because the drug tests on the horse were negative, Exhibit A was negative for illegal substances, Exhibit B contained a legal vitamin, and no one witnessed Dr. Stephenson inject the horse, the Racing Commission failed to carry its burden of proving that Dr. Stephenson administered any substance to the horse within the prohibited time period. It thus reversed the ruling of the commission.
The Racing Commission filed the instant appeal.
Following consideration by a three-judge panel in this Court, one judge dissented from the majority’s opinion to reverse the trial court and reinstate the decision of the Racing Commission. The matter was reheard before a five-judge panel pursuant to LSA-Const. Art. V, § 8, which requires a unanimous decision by a three-judge panel to reverse a civil court judgment. Hence, although this case originated as an administrative matter, it is the opinion of this Court that because the judgment being reviewed is a civil court judgment, albeit a civil court acting in an appellate capacity, the above-referenced Constitutional mandate must be | flfollowed. See generally Brody v. Louisiana State Racing Commission, 470 So.2d 894 (La.App. 4 Cir.1985).
STANDARD OF REVIEW:
The standard for appellate review of an administrative agency decision is distinct and narrower than the standard in general appellate cases. Considerable latitude must be afforded administrative agencies to perform the functions delegated to them by law, and appellate courts should not intervene unless the administrative agency’s actions are clearly arbitrary and unreasonable. Therefore, an appellate court must presume an administrative agency’s ruling to be legitimate and correct, and the burden is on the appellant (Dr. Stephenson *930 at the district court level) to demonstrate the grounds for reversal or modification. Reaux v. Louisiana Bd. of Medical Examiners, 2002-0906 (La.App. 4 Cir. 5/21/03), 850 So.2d 723, 726, quoting Holladay v. Louisiana State Bd. of Medical Examiners, 96-1740 (La.App. 4 Cir. 2/19/97), 689 So.2d 718. This Court further explained that:
The exclusive grounds upon which an administrative determination or decision may be reversed or modified on appeal are enumerated in La. R.S. 49:964(G), La. Const.1974, Art. 5, 510(B). Pursuant to La. R.S. 49:964(G), the district court may not reverse or modify an administrative decision unless the decision was arbitrary, capricious, characterized by an abuse of discretion, clearly unwarranted exercise of discretion, or manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Where the administrative agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues. La. R.S. 49:964(G).

Id.

| T nApplying the above standard, the district court was bound to review the Commission’s factual findings and determine if they were supported by substantial evidence, and whether the Commission’s conclusions and sanctions were arbitrary or capricious, or constituted an abuse of discretion. To reverse, the district court had to find that the Commission’s factual findings were manifestly erroneous. This Court is to apply the same standard of appellate review when reviewing the Commission’s decision.
DISCUSSION:
The Racing Commission argues that the trial court applied an incorrect standard of review because it apparently conducted a de novo review of the record, and substituted its own factual findings and credibility judgments in lieu of the Commission’s. By doing so, the district court usurped the original jurisdiction vested in the Commission to regulate the conduct of racing in Louisiana. After reviewing the record of the Commission’s hearing, and the record made in the district court, we agree.
A thorough reading of the hearing transcript reveals that there was substantial circumstantial evidence to support a finding that Dr. Stephenson injected the horse, Delightster, with some substance within the prohibitive four-hour time period. The two investigators on the scene both testified that they saw Dr. Stephenson holding an empty syringe against the horse’s neck. Dr. Stephenson first attempted to conceal the syringe, and then hesitated to surrender it to the investigators. Dr. Stephenson freely admitted that the syringe had contained AMP h (mixed with a vitamin, thus the fact that the drug analysis proved negative for illegal substances is of no moment. Whether this substance was an illegal narcotic or a vitamin cocktail, injecting any horse with any substance within four hours of post time is a violation of the rules.
Additionally, it taxes the imagination to believe it was mere coincidence that Dr. Stephenson had on his person two syringes, one containing AMP with vitamin B12 in Exhibit A, and the other thiamine mixed with calcium or magnesium in Exhibit B, the two substances Carl Giesse testified he suggested Dr. Stephenson give his horse. Clearly this “coincidence” was not lost on the Commission either as Commissioner Neck pointed out at the hearing.
Dr. Stephenson attempted to explain away the fact that he had an empty syringe in his hand when the investigators *931 found him by stating that he was using it as a “pointing device.” According to Dr. Stephenson, he was attempting to explain the symptoms of colic to an illegal alien groom who did not speak English. When this explanation is coupled with Dr. Stephenson’s other testimony that the syringe had merely fallen out of his pocket as he attempted to sound the horse’s belly with his naked ear, it is easy to see why the Commission gave little credence to either explanation for the presence of the syringe.
In his brief, Dr. Stephenson attempts to lay the blame for this entire situation upon Carl Giesse, complaining that despite Giesse’s culpability he suffered a far more lenient sanction. While we agree that Giesse may have set the wheels in motion for this unfortunate event, we also note that Dr. Stephenson is an educated | ^professional fully capable of discerning right from wrong. Additionally, he has previously been ordered to take ethics classes in connection with other violations. Clearly, he did not have to do what Giesse requested.
In conclusion, we find that it was error for the district court to reverse the decision of the Racing Commission. The factual findings and credibility determinations are fully supported by the record. The Racing Commission is comprised of individuals who are presumably familiar with the racing industry and who review countless alleged infractions yearly. It is in a far greater position to evaluate the evidence, which is why the legislature has limited the appellate court’s latitude in reversing a decision of an administrative agency. Accordingly, we reverse the judgment of the district court, and reinstate the ruling of the Racing Commission in its entirety.
REVERSED.
McKAY, J., dissents with reasons.

. At the time of the hearing, Pevoto was employed by the Louisiana State Police as a trooper.

. Dr. Stephenson explained that these were medications that could be administered legally 24 to 30 hours prior to race time.

.Dr. Stephen Barker, a chemist with the Louisiana State University School of Veterinary Medicine, explained that AMP is an acronym for adenosine monophosphate, a form of stimulant. He further explained that AMP mixed with B vitamins is commonly referred to at racetracks as "red soda pop.”

. No medications of any type may be administered to horses within four hours of race time.

. Lasix is a prescription diuretic given to racehorses to prevent bleeding in the lungs during a race. It is legally administered outside the four-hour rule.

. Investigator McGarity testified that the groom was on the other side of the horse from the doctor. She could only see his legs behind the horse. Giesse testified that the groom could not be called to testify because "he doesn't hardly even speak English.” Giesse also explained that the groom was "living back in Mexico,” because he had to "go back and get his papers in order.”